**UNITED STATES of America,
Plaintiff,**

v.

**UNDETERMINED QUANTITIES OF ARTICLES OF DRUG, Street Drug Alternatives .... et al., Defendants.**

No. Civ. A. AW–00–1687.

United States District Court,
D. Maryland,
Southern Division.

June 12, 2001.

Lynne A. Battaglia, Nadira Clarke, Office of the U.S. Attorney, Baltimore, MD, Richard N. Goldberg, U.S. Department of Justice, Washington, DC, for Plaintiff.

Charles H. Nalls, Armstrong, Westerman, Hattori, et al., Washington, DC, for Defendants.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

Currently pending before the Court are Plaintiff's Motion for Summary Judgment [19–1] and Defendant Perry Hitt's Motion for Partial Summary Judgment [22–1]. The motions have been fully briefed by all parties. No hearing is deemed necessary. *See* Local Rule 105.6. Upon consideration of the arguments made in support of, and opposition to, the respective motions, the Court makes the following determinations.

## I. FACTUAL BACKGROUND

Hit Products, Inc., Riverdale Organics, and Dreamworlds (collectively "Defendants") manufacture, market, and distribute certain products that serve the basis for this controversy. Specifically, the products at issue are named as follows: "Herba Ghani," "Inda–Kind," "Hydro," "Sweet Green," "Chronix," "Rave X," "Rave Energy," "Utopia," "Shroomz," "Liquid X," "Liquid X Export," "Hashanna Oil," "Northern Heights," "Herbal Hash— Mean Green," "Herbal Hash—Honey– Blonde," and "Herbal Opium." The products are made from a mixture of herbs. Defendants specifically market the products via publications and the internet to Generation Xers—the demographic of young adults aged 20 to 30 years-old. The products promise users effects comparable to illegal street drugs that plague America's youth. The United States Food and Drug Administration ("FDA") categorizes such substances as "street drug alternatives" that qualify as misbranded and unapproved new drugs in violation of the Federal Food, Drug, & Cosmetic Act ("FDCA"). Under its statutory authority, the FDA seized Defendants' products. Thereafter, the United States brought the instant action seeking an order of condemnation and permanent injunctive relief against the companies and their President, Perry Hitt.

## II. DISCUSSION

### A. FDA's Guidance on Street Drugs Alternatives

The United States' arguments in this case essentially track the opinion delineated by the FDA in a policy statement issued in April of 2000. In the statement, the FDA defined street drug alternatives as herbal products that claim to mimic the euphoric effects of illegal street drugs. *See Guidance for Industry on Street Drug*

*Alternatives*, 65 Fed.Reg. 17,512 (Apr. 3, 2000). In the notice, the FDA announced its position that street drug alternatives constitute unapproved new drugs and misbranded drugs in violation of §§ 502 and 505 of the FDCA. 65 Fed.Reg. at 17,512. The FDA also asserted that street drug alternatives did not fall within the definition of "dietary supplements" because such products are not "intended to supplement the diet," but rather to modify the psychological states of the user. *Id.* Defendants' products fall within the scope of the FDA's definition of street drug alternatives.

 Defendants maintain that the Guidance is not binding on the parties or the Court. The Court agrees. "A policy statement . . . is not a substantive rule but rather an interpretative statement of position . . . [that] is not subject to rulemaking requirements." *Pelissero v. Thompson*, 170 F.3d 442, 447 (4th Cir.1999). "An interpretation . . . not one arrived at after . . . a formal adjudication or notice-and-comment rulemaking[,] . . . like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 1663, 146 L.Ed.2d 621 (2000).[1] "While . . . a policy statement does not carry as much weight as a rule, it is nonetheless entitled to 'some deference.'" *Pelissero*, 170 F.3d at 447. Such "interpretations . . . are 'entitled to respect' under [the Supreme Court's] decision in *Skidmore v. Swift & Co.*, 323 U.S.

134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), but only to the extent that those interpretations have the 'power to persuade[.]'" *Christensen*, 529 U.S. at 587, 120 S.Ct. at 1663. For the reasons discussed below, the Court finds that FDA's position on street drug alternatives to be highly persuasive in light of the text and purposes of the FDCA.

The Court believes Defendants' characterization of the seized products as "dietary supplements" constitutes a veiled attempt to circumvent federal anti-drug laws and the FDCA. This Court declines to carve out a statutory loophole for drug manufacturers attempting to profit from the illegal drug epidemic by masquerading potentially dangerous substances as legitimate dietary supplements. Such mischaracterizations are not only contrary to the language of the Dietary Supplement Health and Education Act of 1994 ("DSHEA"), but also undermines the manifest purposes of the FDCA.

### B. *Dietary Supplements*

The United States asserts that Defendants' products are marketed as alternatives to illicit street drugs, such as marijuana, Ecstasy, hashish, and opium. Defendants counter that the products are dietary supplements and, therefore, are exempt from the definition of "drug" under the Dietary Supplement Health and Education Act of 1994 ("DSHEA").

 Section 3 of DSHEA defines a dietary supplement as:

---

1. When a federal agency's interpretation of its implementing statute is the product of a rulemaking procedure, the resolution of a challenge is governed by *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under the two step *Chevron* test, the reviewing court must first answer whether Congress has clearly spoken on the issue within the statute.

*Id.* at 842, 104 S.Ct. 2778. If not, the analysis turns to whether the agency's interpretation is based on a permissible construction of the statute. *Id.* An agency interpretation that is "well within the bounds of reasonable interpretation . . . [is] entitled to deference under *Chevron*." *Your Home Visiting Nurse Services v. Shalala*, 525 U.S. 449, 119 S.Ct. 930, 934, 142 L.Ed.2d 919 (1999).

a product (other than tobacco) intended to supplement the diet that bears or contains one or more of the following dietary ingredients: (A) a vitamin; (B) a mineral; (C) an herb or other botanical; (D) an amino acid; (E) a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or (F) a concentrate, metabolite, constituent, extract, or combination of any ingredient described in clause (A), (B), (C), (D) or (E).

Few courts have interpreted this amendment to the FDCA by the DSHEA. *See Pharmanex v. Shalala*, 221 F.3d 1151 (10th Cir.2000). Nonetheless, as a prerequisite to application of the DSHEA, the product must be labeled as a "dietary supplement." *See* 21 U.S.C. § 321(ff)(2)(C); S.Rep. No. 103–410 (1994), 1994 WL 562259. The vast majority of Defendants' products are not labeled in compliance with the Act and, therefore, cannot be classified as "dietary supplements" within the meaning of 21 U.S.C. 321(ff).

■ Only the product, "Utopia," is labeled as a "dietary supplement." However, this alone does not preclude FDA regulation as a "drug." The Second Circuit has ruled that a product may qualify as a "dietary supplement" under § 321(ff) for certain purposes under the FDCA and may also qualify as a "drug" under § 321(g)(1)(C). *See United States v. Ten Cartons, More or Less, of an Article*, 72 F.3d 285, 287 (2d Cir.1995) (per curiam). "[A] dietary supplement 'is not a drug under clause (C) *solely* because the label or labeling contains' certain 'truthful and not misleading statement[s]' regarding the supplement's benefits related to classical nutrient deficiency diseases." *Id.* at 287 (emphasis in original). In other cases, "a dietary supplement's status as a ... drug should be determined by the application of

§ 321(g)(1)(C) without reference to the terms and provisions of § 321(ff)." *Id.*

Here, the FDA is not seeking to regulate "Utopia" based solely upon truthful and not misleading claims concerning its nutritive benefits. "Utopia's" labeling does not make such claims. Thus, even assuming that "Utopia" qualifies as a "dietary supplement" under § 321(ff), this status does not preclude the product from being classified as a "drug" under § 321(g)(1)(C) if it meets the statutory definition. Thus, the next issue is whether the products may be properly classified as drugs under the FDCA.

### C. Drugs

■ The United States asserts that the Defendants' products are drugs because they are intended to affect the structure and function of the human body by altering the psychological states of users. Defendants counter that the products' appeal to "alternative" lifestyles does not elevate them to "drug" status. The FDCA defines "drug" as "articles (other than food) intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1)(C). Thus, "the definition of drug ... require[s] not only that the article 'affect the structure or any function of the body,' but also that these effects be intended." *Brown & Williamson Tobacco Corp. v. Food & Drug Admin.*, 153 F.3d 155, 163 (4th Cir.1998), *aff'd*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Of primary significance in determining whether a product may be deemed a "drug" is its intended use or effect as gathered from the objective evidence disseminated by the vendor. *See United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug*, 22 F.3d 235, 239 (10th Cir.1994) ("[T]he labeling and marketing claims made by [the defendant] make the sub-

stance a drug under § 321(g)(1)(B)."); *United States v. Storage Spaces Designated Nos. 8 & 49*, 777 F.2d 1363, 1366 (9th Cir.1985). "[A product] will be deemed a drug if the labeling, including separate promotional claims, attributes characteristics to the product that would bring it within the Act's definition." *United States v. Article Consisting of 36 Boxes, etc.*, 415 F.2d 369, 370 (3d Cir.1969).

An examination of the labeling and promotional claims made by Defendants reflect an intent for the products to affect the function of the mind. The labeling for "Rave X" employs the phrases "ELECTRIFY YOUR SENSES," "BE HAPPY," and "RAGING POTENCY." (Pl.'s Mot. Summ. J. Ex. D at 1.) The product promises "effects in 15–45 min[utes]" of use. (See Ex. D at 1.) "Rave Energy" is labeled as "the Strong Legal X alternative" and being "extremely potent." (Pl.'s Mot. Summ. J. Ex. D at 2.) The label for "Utopia" states "Xperience the natural sensation" and promises that the product "lasts 4–5 hours." (*Id.* at 3.) "Shroomz" includes a picture of a grinning figure with a mushroom atop his head suggesting to users "FEED YOUR HEAD." (*Id.* at 4.) The label states that the product is of "Pharmaceutical quality & safety," "Full of shroomy goodness," and "lasts 3–5 hours with no unpleasant side effects." (*Id.*) The labels for "Liquid X" and "Liquid X Export" explicitly state that they are "known in the club scene as Liquid Ecstasy." (*Id.* at 5, 6.) The labels described "Liquid X" and "Liquid X Export" as "unique & extremely powerful liquid infusion of enlivening organics," and "EXTREMELY POTENT" with "effects in 15—45 min." (*Id.*) "Hashanna Oil" states that users can "obtain full hashanna effect with just a few drops . . . ." and "BE HAPPY." (*Id.* at 7.) "Northern Heights" includes another smirking figure with the slogans "Intensify your Smoking adventures" and "Legal &

Naturally Satisfying." (*Id.* at 8.) The labels for "Herbal Hash—Mean Green" and "Herbal Hash—Honey–Blonde" describe the smokables as the "Ultra Chronic Blend" that comes "HIGHly recommended." (*Id.* at 9, 10.) The labels instruct the user to "enjoy," "chill," and "repeat as needed every 2–4 hours." (*Id.*) "Inda–Kind" is labeled as a "chronic smoke/incense blend" with the slogan "BE HAPPY." (*Id.* at 11.) The label for "Hydro" describes the product as a "Stoney Hyrdophonic Smoke" with an "uncanny appearance and familiar effect." (*Id.* at 12.) "Chronix" suggests the user "Get hooked" and "Step into the 60's." (*Id.* at 13) "Herbal Opium" is labeled as an "ultra-potent" herbal smoke "offered for those who seek enlightenment of the soul." (*Id.* at 14.) The label for "Herba Ghani" states "high potency smoking herb" and "Ultra–Potent Smoke." (*Id.* at 15.) The Court finds that the slogans and descriptions incorporated into the labels of the products evidence an intent for the products to have a mind altering affect on the user.

Moreover, many of the products are marketed as substitutes for illegal drugs. *Cf. United States v. Storage Spaces Designated Nos. 8 and 49 Located at 277 East Douglas, Visalia, Cal.*, 777 F.2d 1363, 1366 (9th Cir.1985) (finding naming, catalogs, and advertisements of products suggested the items were similar to cocaine). For example, the name of the herbal smoking blend "Chronix" is strikingly similar to the word "Chronic." Chronic is commonly used by Generation Xers, Defendant's admitted target market, as slang for marijuana. (See Gauvin Aff. at 6.) The same is true for the other ultra potent smoking herbs marketed by Defendants as "Herbal Hash" (Hash) and "Herb Ghani" (Ghanja). (See id.) "Shroomz" is used as slang for the psilocybin or psychotropic mushrooms. Defendants openly advertise that users

identified "Liquid X" and "Liquid X Export" as Liquid Ecstasy. "X" and "E" are slang terms for Ecstasy. (*See id.*) The catalog for Defendants' products explicitly states that the products are "for mood enhancement." Moreover, the labeling for several products indicates an intent that the user should feel the "effects" of the substances for a prescribed period of time.

The magazine advertisement for "Hydro," "Herbal Hash," "Inda–Kind," "Sweet Green," and "Herbal Opium" tout the products as "The Best Legal Buds in the Biz" and the "Strongest legal BUDS on the market." (Pl.'s Mot. Summ. J. Ex. E at 2.) An advertisement for "Inda–Kind" includes testimonials stating that "Inda–Kind produced the strongest effects by far" and "did the trick, we're all stoked." (*Id.* at 5.) Similarly, the advertisement for "Utopia" has a testimonial that states "6 hours feelin' fine." (*Id.* at 7.) A testimonial for "Hyrdo" states "F____ing amazing Hydro totally works." (*Id.* at 10.) Defendants advertised "Herbal Opium" as having a "very strong, long burning, stunning effect." (*Id.*)

Here, there is no genuine dispute that the labels accompanied the products and the marketing materials were made to promote the products at issue. "[W]here, ... there is no dispute concerning the wording and description of the labeling and other promotional materials or activities that relate to the products, the legal conclusion to be drawn therefrom can and should be resolved on summary judgment." *United States v. Kasz Enterprises, Inc.*, 855 F.Supp. 534, 538 (D.R.I.1994). After reviewing the labeling and promotional materials, the Court finds that the objective evidence demonstrates that the products at issue were intended to affect the function or structure of the mind by elevating the psychological condition of users. Accordingly, the Court holds that the seized products are drugs with the meaning for the FDCA.

## D. *New Drugs*

The United States maintains that the products are unapproved new drugs. The FDCA defines a "new drug" as "[a]ny drug ... the composition of which ... is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 321(p)(1). Defendants assert that their products are generally recognized by qualified experts to be safe and effective and, therefore, cannot be categorized as "new drugs."

" '[G]eneral recognition' of effectiveness requires at least 'substantial evidence' of effectiveness for approval of [a new drug application]." *Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 629, 93 S.Ct. 2469, 2483, 37 L.Ed.2d 207 (1973). Thus, " 'general recognition' requires a two-step showing: first, that there is general recognition in fact, i.e., that there is an expert consensus that the product is effective; and second, that the expert consensus is based upon 'substantial evidence' as defined in the Act and in FDA regulations." *United States v. An Article of Drug Consisting of 4,680 Pails, More or Less, Each Pail Containing 60 Packets, Etc.*, 725 F.2d 976, 987 (5th Cir. 1984). "General recognition of safety and effectiveness shall ordinarily be based upon published studies which may be corroborated by unpublished studies and other data and information." 21 C.F.R. § 314.200. "Substantial evidence does not consist of the expressed opinions of experts hired to testify on behalf of one party or the other. Instead, it consists of adequate and well-controlled studies that

must be generally available to the scientific community." *An Article of Drug Consisting of 4,680 Pails, More or Less, Each Pail Containing 60 Packets, Etc.*, 725 F.2d at 987. The "FDA's 'judgments as to what is required to ascertain the safety and efficacy of drugs fall squarely within the ambit of the FDA's expertise and merit deference from [the courts].' " *Zeneca, Inc. v. Shalala*, 213 F.3d 161, 170 (4th Cir.2000) (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1490 (D.C.Cir.1995) (quoting *Schering Corp. v. FDA*, 51 F.3d 390, 399 (3d Cir.1995))).

 The United States has submitted a declaration from Dr. Charles J. Ganley, a Drug Science Officer from the United States Drug Enforcement Administration (DEA). According to Dr. Ganley, the FDA conducted extensive searches of published and unpublished scientific literature on each product, by tradename and the combination of ingredients. The search did not reveal any studies or clinical data establishing the safety and effectiveness of any of the products in issue. The absence of literature establishing the safety and efficacy of a product is proof that the requisite general recognition does not exist. *See, e.g., United States v. 41 Cases More or Less*, 420 F.2d 1126, 1130 (5th Cir.1970). To rebut the Government's case, Defendants rely on publications from *The Handbook of Medicinal Herbs* and *The Pharmacology of Chinese Herbs* as proof of the products' efficacy. (Defs.' Opp'n, Ex. 3.) These publications merely described the herbal ingredients contained in some of the products. The safety and efficacy of the complete product, not its components, is the central issue. *See United States v. Generix Drug Corp.*, 460 U.S. 453, 459, 103 S.Ct. 1298, 1301–02, 75 L.Ed.2d 198 (1983). As a matter of law, this evidence is insufficient to create a genuine dispute

of material fact as to the lack of general recognition of the safety and efficacy of the Defendants' products. Therefore, the Court finds that the Defendants' products are "new drugs" under the FDA.

Before a new drug may be marketed in the United States, the FDA must approve a new drug application ("NDA") submitted by the manufacturer. 21 U.S.C. § 355(a). There is no dispute that the products at issue were marketed in the United States and did not go through the FDA approval process. Therefore, the Court finds that there is no genuine dispute of material fact that the products in controversy are unapproved new drugs.

### E. *Misbranded*

 The United States maintains that the Defendants' products are misbranded because the directions on the labels are not based upon any clinical data that could substantiate the recommended levels for safe dosage. Defendants respond that the labeling is adequate for dietary supplements. Section 331 prohibits "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated and misbranded." 21 U.S.C. § 331(a). A product is misbranded if it fails to include adequate directions for use. *See* 21 U.S.C. § 352(f)(1). " 'Adequate directions for use' means directions under which the layman can use a drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.5; *see also United States v. Articles of Drug*, 625 F.2d 665 (5th Cir.1980). "Where non-prescription drugs are involved, the 'adequate directions for use' requirement insures full disclosure to the layman purchasing the drugs for self-treatment." *United States v. Evers*, 643 F.2d 1043, 1052 (5th Cir.1981). "Courts must show substantial deference to the construction of a statute and regulations by an

agency charged with their enforcement particularly where, as here, the agency is empowered not only to construe its governing statute, but additionally to make safety judgments delegated to it by Congress ...." *United States v. Algon Chemical Inc.*, 879 F.2d 1154, 1159 (3d Cir.1989).

The labels for several disputed products generally instruct users to take a certain amount of the item. For example, "Rave X" instructs users to take 3–5 tablets. (Pl.'s Mot. Summ. J., Ex. D at 1.) For "Rave Energy," the recommended dosage is 1 or 2 tablets. (*Id.*) "Liquid X" and "Liquid X Export" suggest dosages from 1/4—1/2 tsp. (*Id.* at 2.) "Herbal Hash— Mean Green" and "Herbal Hash—Honey– Blonde" generally instruct the user to place small pieces of the product on top of another herbal blend; smoke and enjoy; chill/engage in recreational activity; and repeat as need every 2–4 hours. (*Id.* at 9, 10.) "Northern Heights" directs users to add a few drops to smoking material; enjoy; and repeat as needed. (*Id.* at 8.) Although laymen could understand the directions, there is no proof that the provided instructions for any of the Defendants' products are safe for the intended use of altering the psychological condition of the user. Essentially, in the absence of investigations or clinical data demonstrating the safety and efficacy of the drugs, there can be no adequate instruction for their *safe* use. *Cf. United States v. Article Consisting of 46 Devices, "Dynatone,"* 315 F.Supp. 588, 591 (D.Minn.1970) ("Certainly no instructions could be adequate and obviously cannot be written or devised for a device which does not work in the first place.").

Furthermore, in the absence of "clinical proof, in the form of adequately controlled clinical studies, which establishes that ... [the] product, is effective for any indicated use[,][a]ny representation as to [its] proven efficacy is false and misleading, and therefore, [the product] is misbranded." *United States v. Sene X Eleemosynary Corp., Inc.*, 479 F.Supp. 970, 980 (D.Fla. 1979). Along similar lines, any representation as to the safety of a product in the absence of clinical proof renders the product misbranded under the FDCA. "Rave X," "Rave Energy," "Utopia," "Shroomz," "Hashanna Oil," "Inda–Kind," and "Herba Ghani" make representations that the products are safe or may be used to party safely. As discussed earlier, there are no clinical studies to substantiate the Defendants' claims of safety.

 "Hydro," "Chronix," "Herbal Opium," and "Sweet Green" provide no instructions for their intended use. While there is no "Sweet Green" label for the Court to review, the determination of whether the product is misbranded may rest on its advertisements. Under the FDCA, "[a]ny printed material, including books and pamphlets, which refers to or explains the usefulness of a product and which is used, in any way, in its sale 'accompanies' the article in the statutory sense and constitutes 'labeling.'" *Kasz Enterprises, Inc.*, 855 F.Supp. at 541.[2] The advertisements explain that "Sweet Green" is an "ultra-potent smoke," but provide no direction as to its safe use. Furthermore, "Utopia's" labeling as a dietary supplement is insufficient because it fails to list the quantity of each ingredient in the product. *See* 21 U.S.C. § 343(s)(2)(A).

There is no dispute that the products were introduced into interstate commerce

---

**2.** Labeling is defined as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrap-

pers, or (2) accompanying such article." 21 U.S.C. § 321(m).

as the products consisted of ingredients that crossed state lines and the products themselves were sold across jurisdictions. There is no evidence to suggest that the products fall within an exemption to the labeling requirements. *See* 21 C.F.R. § 201.122. Therefore, for the above discussed reasons, the Court finds the Defendants' products to be misbranded under § 352(f) of the FDCA.

### F. *Commercial Speech*

Defendants assert that the policy of the FDA as set forth in its *Guidance for Industry on Street Drug Alternatives*, 65 Fed.Reg. 17,512 (Apr. 3, 2000) impermissibly limits commercial speech in violation of the First Amendment. Defendants also argue that the FDA cannot limit the marketing of otherwise legal products.

 "[I]n order for commercial speech to be entitled to any First Amendment protection, the speech must first concern lawful activity and not be misleading." *Penn Advertising of Baltimore, Inc. v. Mayor and City Council of Baltimore*, 63 F.3d 1318, 1325 (4th Cir.1995), *vacated*, 518 U.S. 1030, 116 S.Ct. 2575, 135 L.Ed.2d 1090 (1996), *aff'd on remand*, 101 F.3d 332 (4th Cir.1996). As explained in this opinion, the labeling and advertising for the unapproved new drugs at issue are misleading in that they claim to be safe and effective without any scientific support. Therefore, the products are entitled to no First Amendment protections. Secondly, the FDA's guidance does not prohibit the advertising of the Defendants' products. Rather, the advertisements and labels are merely used as proof of the Defendants' intended use of the products in establishing violations of the FDCA. The use of such materials to ascertain the intent of the manufacturer does not implicate the First Amendment. *See Church of Scientology of Cal. v. Richardson*, 437 F.2d 214, 218 (9th Cir.1971) (holding that, in determining product's intended use, courts can validly consider the defendant's publications without impinging First Amendment freedoms); *United States v. Article of Drug Designated B–Complex Cholinos Capsules*, 362 F.2d 923, 927 (3d Cir.1966) ("There is nothing new or alarming in a ruling that statements . . . adopted by that party as its own representations may be taken in a civil action as evidence of that party's intention as to matters in which the intention is a material issue."). Accordingly, the Court finds that the FDA's *Guidance for Industry on Street Drug Alternatives* does not impinge upon any protected right to commercial speech under the First Amendment.

### G. *Condemnation*

 The United States seeks an order of condemnation for the Defendants' drugs. Under the FDCA, misbranded drugs may be condemned: (1) when introduced into or (2) while in interstate commerce or (3) while held for sale after shipment in interstate commerce. 21 U.S.C. § 334(a)(1). If a drug is confiscated because it is an unapproved "new drug," it must be shown to have been introduced or delivered for introduction into interstate commerce before it may be condemned. 21 U.S.C. § 355(a). There is no dispute that the products were introduced into interstate commerce through their national sale and distribution before condemnation and were held for sale after shipment in interstate commerce. Accordingly, the Court finds that an order of condemnation is appropriate under either theory.

### H. *Injunctive Relief*

 The United States seeks an injunction permanently restraining the Defendants from further introducing unapproved new drugs or misbranded drugs

into interstate commerce. This Court's power to grant injunctive relief for violations of the FDCA stems from 21 U.S.C. § 332(a). In order to obtain an injunction, the Government must establish that the Defendants violated the FDCA and that there exists "some cognizable danger of recurrent violation...." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). As discussed earlier, the Court has found several violations of the FDCA. Thus, whether a permanent injunction is warranted depends on a finding that "some cognizable danger of recurrent violation" exists. *Id.*

Factors that a district court may consider in making this finding include the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the extent to which the defendant's professional and personal characteristics might enable or tempt him to commit future violations; and the sincerity of any assurances against future violations. *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 854–55 (9th Cir.1995). The Defendants manufactured and distributed approximately fifteen unapproved new drugs. To compound the initial violations, the Defendants misbranded these products as well. Furthermore, the United States notified the Defendants of the FDCA violations on several occasions. Each time, the Defendants recalcitrantly disputed any violation and steadfastly attempted to characterize their products as "dietary supplements." "Even if [the defendant] had not intended to violate the regulation, its continued insistence on justifying its actions in committing the violation 'is an important factor in deciding whether future violations are sufficiently likely to warrant an injunction.'" *Laerdal Mfg. Corp.*, 73 F.3d at 856 (quoting *Federal Election Comm'n v. Furgatch*, 869 F.2d 1256, 1262 (9th Cir.1989)).

The Defendants have made no assurances against future violations. There is an inherent danger to the public in the dissemination of drugs with no support as to their safety or efficacy. Under these circumstances, the Court believes that permanent injunctive relief represents an appropriate remedy to prevent future endangerment to the public by recurrent violations of the Defendants. *See United States v. Generix Drug Corporation*, 707 F.2d 835 (5th Cir. 1983).

## I. *Allegations against Perry L. Hitt as an Individual*

■ Defendant, Perry Hitt, asserts that the action against him is improper because he is named as a defendant by virtue of his position as President of Hit Products, Inc., Riverdale Organics, and Dreamworlds. Mr. Hitt asserts that he did not personally participate in the manufacture, sale, or distribution of the products at issue. Thus, according to Mr. Hitt, he cannot be held liable for the corporate defendants' violations unless the Court pierces the corporate veil. The Court disagrees.

■ The FDA's statutory authority empowers the government to seek relief against corporate executives, as well as legal entities, in enforcement actions. "[C]orporate agents vested with the responsibility, and power commensurate with that responsibility, to devise whatever measures are necessary to ensure compliance with the Act bear a 'responsible relationship' to, or have a 'responsible share' in, violations." *United States v. Park*, 421 U.S. 658, 672, 95 S.Ct. 1903, 1911, 44 L.Ed.2d 489 (1975); *see United States v. Dotterweich*, 320 U.S. 277, 284, 64 S.Ct. 134, 138, 88 L.Ed. 48 (1943) (holding all corporate officers, "who do have ... a responsible share in the furtherance of the transaction which the statute outlaws[,]"

liable for the corporation's misdemeanor offense under the FDCA). While the Supreme Court cases imposed criminal liability upon the individual corporate officers for violations of the FDCA, "the rationale for holding corporate officers criminally responsible for acts of the corporation, which could lead to incarceration, is even more persuasive where only civil liability is involved, which at most would result in a monetary penalty." *United States v. Hodges X–Ray, Inc.,* 759 F.2d 557, 561 (6th Cir.1985). "The fact that a corporate officer could be subjected to criminal punishment upon a showing of a responsible relationship to the acts of a corporation that violate health and safety statutes renders civil liability appropriate as well." *Id.*

Therefore, there is no need to "pierce the corporate veil" in order to hold Mr. Hitt responsible for the violations of the FDCA. Likewise, personal participation in "line" activity is not a prerequisite to the imposition of liability. Rather, the United States must show that Mr. Hitt had responsible relationship to, or a responsible share in the furtherance of, the transactions outlawed by the FDCA. *See Park,* 421 U.S. at 672, 95 S.Ct. at 1911.

Under the standard set forth in *Park,* the Court believes there is sufficient evidence to rebut Mr. Hitt's motion for partial summary judgment. Mr. Hitt "manages the company at a strategic level in his offices in Beltsville, Maryland ...." (Defs.' Opp'n. at 3.) Mr. Hitt acknowledges that he "review[s] financial matters and undertakes the general functions of a corporate officer" and is "familiar with all phases of its operations." (Hitt Aff. at 2.) The FDA Warning Letter delineating alleged FDCA violations was addressed to Mr. Hitt. (Pl.'s Mot. Summ. J. Ex. A.) The evidence indicates that Mr. Hitt was aware of potential FDCA violations and had the power to take preventive or corrective action. The Court finds such evidence sufficient to impose civil liability upon Mr. Hitt for the FDCA violations.

Lastly, Mr. Hitt asserts that this Court has no personal jurisdiction over him because he is a resident of Florida. In determining whether personal jurisdiction exists, the Court engages in a two-part analysis. "In the first step, [the Court] determine[s] whether the long-arm statute authorizes the exercise of jurisdiction in the circumstances presented. If answer[ed] ... affirmatively, [the Court] consider[s] whether the exercise of jurisdiction comports with Fourteenth Amendment due process standards." *Ellicott Mach. Corp., Inc. v. John Holland Party Ltd.,* 995 F.2d 474, 477 (4th Cir.1993). "Because the Maryland legislature designed its long-arm statute to extend personal jurisdiction to the limits allowed by federal due process, [the] normal two-step inquiry merges into one." *Id.* When a party "purposefully avails itself of the privilege of conducting activities within" Maryland, "creat[ing] a 'substantial connection' between itself and Maryland," such "instate activity creates 'certain minimum contacts such that maintenance of the suit [in the state] does not offend traditional notions of fair play and substantial justice.'" *Stover v. O'Connell Assocs., Inc.,* 84 F.3d 132, 136 (4th Cir.1996) (citations omitted).

The Maryland long-arm statute provides, in pertinent part, that "[a] court may exercise personal jurisdiction over a person, who directly or by an agent: (1) Transacts any business or performs any character of work or service in the State." Md. Ann.Code, *Cts. & Jud. Proc.,* § 6–103(b)(1) (1998). Mr. Hitt's activities certainly fall within § 6–103(b)(1) of the Maryland long-arm statute. As stated earlier, Mr. Hitt personally managed the operations of the corporate defendants

and performed the traditional functions of a corporate officer from the state of Maryland and, apparently, had been doing so for several years. Further, Mr. Hitt's activities in Maryland satisfy Fourteenth Amendment due process standards. Mr. Hitt directed the business activities of the corporate defendants from their headquarters based in the state of Maryland, establishing a substantial connection between himself and Maryland. *Cf. Ciena Corp. v. Jarrard,* 203 F.3d 312, 318 (4th Cir.2000) (finding personal jurisdiction where the defendant's contacts with Maryland arose out of her activities as an executive, serving a Maryland-based company at its headquarters).

 .It is true that Maryland recognizes the fiduciary shield doctrine which "serves as a limitation on the reach of a long-arm statute with respect to obtaining jurisdiction over an individual who acted solely as a representative of a corporation, rather than on his or her own behalf." *Christian Book Distributors, Inc. v. Great Christian Books, Inc.,* 137 Md.App. 367, 378–79, 768 A.2d 719, 725 (2001). "The fiduciary shield doctrine protects an individual, who acts in the forum state solely as the representative of the corporation, from suit in that state because he does not personally avail himself of the laws and protection of the forum state in any meaningful way." *Zeman v. Lotus Heart, Inc.,* 717 F.Supp. 373, 375 (D.Md.1989). There are two recognized exceptions to the doctrine: "(1) when the individual is the altered ego of the corporation or (2) when the individual has a substantial interest in the corporation." *Christian Book Distributors, Inc.,* 137 Md.App. at 378, 768 A.2d at 725. Here, Mr. Hitt is not only a corporate officer, but is also a shareholder indicating his substantial financial interest in the operations of the corporate defendants. "It would violate a sense of fair-

ness to permit [Mr. Hitt] to solicit, negotiate, and consummate corporate business in Maryland in which [he] personally had so direct and substantial an interest and then allow [him] to avoid responding in Maryland to legal charges addressed to [him] personally, which arise from those transactions." *Zeman,* 717 F.Supp. at 377. Furthermore, courts have held that, because section (b)(1) of the long-arm statute purports to authorize jurisdiction to the peripheral limits of due process, the fiduciary shield doctrine does not apply when personal jurisdiction is based upon this provision. *See Zeman,* 717 F.Supp. at 376; *Copiers Typewriters Calculators, Inc. v. Toshiba Corp.,* 576 F.Supp. 312 (D.Md. 1983). Therefore, the Court finds that Mr. Hitt's contacts with Maryland are sufficient to exercise personal jurisdiction over him under § 6–103(b)(1).

## III. CONCLUSION

For the reasons stated above, the Court will grant Plaintiff's Motion for Summary Judgment and deny Defendants' Motion for Partial Summary Judgment. The Court also finds that the circumstances warrant an order of condemnation as well as injunctive relief. An Order consistent with this Opinion will follow.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion dated June 12th, 2001, IT IS this 12th day of June, 2001 by the United States District Court for the District of Maryland, hereby **OR-DERED**:

1. That Plaintiff's Motion for Summary Judgment [19–1] BE, and the same hereby IS, **GRANTED**;

2. That Defendant's Motion for Partial Summary Judgment [22–1] BE, and the same hereby IS, **DENIED**;

3. That seized articles are hereby condemned and forfeited to the United States of America, pursuant to 21 U.S.C. § 334(a) and the United States Marshal is hereby ordered to destroy them;

4. That, pursuant to 21 U.S.C. § 334(e), the Defendant-claimant of the seized articles shall pay to the United States all court costs, service fees, storage costs, and other proper expenses incurred in connection with the case and the destruction of the seized articles;

5. That Plaintiff's request for general injunctive relief BE, and the same hereby IS, **GRANTED**;

6. That Defendants, their officers, agents, servants, employees, and all those persons in active concert or participation with them who receive actual notice of this Order are hereby enjoined, from doing or causing to be done, directly or indirectly, any of the following with respect to any article of drug designated as: "Rave X," "Rave Energy," "Utopia," "Shroomz," "Liquid X," "Liquid X Export," "Hashanna Oil," "Northern Heights," "Herbal Hash—Mean Green," "Herbal Hash—Honey—Blonde," "Herbal Opium," "Herba Ghani," "Inda–Kind," "Hydro," "Sweet Green," "Chronix," or the same article designated by any other names, or any other similar article of drug:

(A) Introducing or delivering for introduction into interstate commerce any such article unless and until (1) an approved application filed pursuant to 21 U.S.C. § 355(b) is effective with respect to said drug, or (2) A Notice of Claimed Investigational Exemption for such drug, filed by defendants pursuant to 21 U.S.C. § 355(i) and 21 C.F.R. § 312.1, has been accepted as adequate by the Food and Drug Administration;

(B) Introducing or delivering for introduction into interstate commerce any such article of drug so long as the article is misbranded within the meaning of 21 U.S.C. § 352 or introducing or delivering for introduction into interstate commerce any labeling or other promotional materials which cause such drug to be so misbranded;

(C) Causing said drug to be misbranded, within the meaning of 21 U.S.C. § 352(f)(1), while it is held for sale after shipment in interstate in violation of 21 U.S.C. § 331(k); or

(D) Promoting, compounding, packing, and/or labeling any such article of drug within the jurisdiction of this Court, while the drug is held for sale after shipment of one or more of its components in interstate commerce, which act(s) of promoting, compounding, packing, and/or labeling result(s) in such drug being misbranded in one or more of the fashions set forth above in subparagraphs B and C;

7. That the parties attempt to negotiate a proposed consent decree consistent with this Court's Memorandum Opinion and Order to address more specific injunctive relief necessary for implementing the Court's rulings;

8. That, within ten (10) days of the date of entry of this Order, the parties contact the Court with the status of their negotiations; and

9. That the Clerk of the Court mail copies of this order to all counsel of record.